U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 MAR -5 PM 2:58

CLERK

BY____LAW_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

STUART R.,                          )
                                    )
            Plaintiff,              )
                                    )
    v.                              )       Case No. 2:17-cv-00225
                                    )
ANDREW SAUL,                        )
Acting Commissioner of             )
Social Security,                    )
                                    )
            Defendant.              )

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT REVERSING THE COMMISSIONER'S DECISION AND GRANTING THE COMMISSIONER'S MOTION TO AFFIRM
(Docs. 9 & 15)

Plaintiff Stuart Jay Robinson is a claimant for Social Security Disability Insurance

Benefits ("DIB") under the Social Security Act ("SSA"). He brings this action pursuant

to 42 U.S.C. § 405(g) to reverse the decision of the Social Security Commissioner (the

"Commissioner") that he is not disabled.[1] (Doc. 9.) The Commissioner moves to affirm.

(Doc. 15.) The court took the pending motions under advisement on October 12, 2018.

After Plaintiff's application was initially denied, Administrative Law Judge

("ALJ") James J. D'Alessandro found Plaintiff ineligible for benefits based on his

conclusion that Plaintiff can perform his past job as an attorney and was therefore not

disabled as of the alleged onset date of December 31, 2008. Plaintiff identifies the

---

[1] Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

following errors in the disability determination: (1) the ALJ failed to consider the correct alleged onset date ("AOD"); (2) the ALJ's Residual Functional Capacity ("RFC") assessment was not based on substantial evidence; and (3) the ALJ erred in finding Plaintiff could perform his past relevant work as an attorney.[2]

Plaintiff is self-represented. The Commissioner is represented by Special Assistant United States Attorney James Desir.

## I.    Procedural History.

Plaintiff filed his application for DIB on August 26, 2013 alleging an onset date of December 31, 2008 for the following medical conditions: coronary artery disease ("CAD"), high blood pressure, cholesterol, atrial fibrillation, shortness of breath, and muscle weakness. (AR 578.) The Social Security Administration denied his request initially and on reconsideration. Plaintiff timely requested a hearing before an ALJ, which was held on November 12, 2015 via videoconference. Plaintiff represented himself at the hearing and testified. Although no vocational expert testified, Plaintiff's legal assistant Cheryl Brown testified regarding Plaintiff's work activities. ALJ D'Alessandro issued an unfavorable decision on March 2, 2016. Plaintiff appealed this decision, which the Appeals Council denied on September 15, 2017. The ALJ's decision stands as the Commissioner's final decision.

On November 10, 2015, two days prior to the ALJ hearing, Plaintiff sent a fax to ALJ D'Alessandro attaching exhibits in support of his appeal of the Social Security Administration's denial of benefits in which he requested retroactive disability benefits "from 11/8/2013 through the present with adjustment credit for insurance benefits and continuing." (AR 658.) In a section titled "[r]econsideration issues[,]" he stated the "[a]lleged onset date of 12/31/2008 is incorrect. Correct answer is SSA (Claimant's 65th Birthday 11/07/2013)." (AR 659.) The ALJ noted this information in his decision.

---

[2] Although Plaintiff also challenges the determination of his Medicare benefits based on a joint tax return, that claim is not before the court.

## II.  Factual Background.

Plaintiff was born on November 7, 1948. He has been an attorney for over forty years and continued to practice law part-time (forty hours per month) as a solo practitioner through the date of the ALJ hearing. He previously had private disability insurance as an attorney, which ended on November 7, 2013. His tax returns during the alleged disability period indicate he had no reported income from 2009 through 2011 and 2013 and had only $712 of reported income in 2012; however, he reported gross receipts and significant expenses related to his law practice during this time period, including expenses for contract labor. As part of his law practice expenses in 2011, Plaintiff reported driving 9,679 miles.

Plaintiff was ordained as a rabbi in June of 2012 and offers part-time rabbinical services. He was elected to his local school board in 2012 but has since resigned due to the position's interference with his rabbinical duties. He resides with his wife on a farm in Grand Isle, Vermont.

### A.  Plaintiff's Medical History.

On December 1, 2008, cardiologist Philip A. Ades, M.D., treated Plaintiff for CAD and severe hyperlipidemia. Although Plaintiff did not exhibit any angina or atrial fibrillation, he had increased fatigue, slight nausea, and felt "mentally off base" due to stress at work and with his wife's chronic illness. (AR 2898.) Plaintiff reported he had recently transitioned from a group practice to one based in his home. At an April 2009 appointment with Dr. Ades, Plaintiff reported similar symptoms as well as difficulty breathing although he noted that he was "keeping active on his 72-acre plot of land[.]" (AR 3266.) Dr. Ades determined that Plaintiff's lipid parameters were "way, way out of control" and recommended an increase in Plaintiff's cholesterol medications. (AR 3267.) He also arranged for a consultation with an endocrinologist for Plaintiff's fatigue, which Plaintiff had attributed to testosterone therapy.

In June of 2009, Plaintiff attended a consultation at the Fletcher Allen Health Endocrinology Clinic of the University of Vermont ("Fletcher Allen"). He denied having chest pain or shortness of breath, experiencing excessive daytime sleepiness, or falling

3

asleep easily during regular activities such as driving. He further reported he snored but had not been diagnosed with sleep apnea. A physical examination revealed Plaintiff was alert, oriented, in no acute distress, and had no cardiovascular or respiratory abnormalities.

During an August 2009 visit with Dr. Ades, Plaintiff denied having heart palpitations, angina, or difficulty breathing upon exertion. Plaintiff saw Dr. Ades again in September and was found to be in rapid atrial fibrillation. At the time, Plaintiff was prescribed Cardizem and had begun taking Coumadin. Plaintiff complained of feeling "off center" and short of breath with exertion and at nighttime, although he denied having angina. (AR 3281.) On September 21, 2009, cardiologist Robert Lobel, M.D., evaluated Plaintiff for atrial fibrillation, during which Plaintiff reported difficulty breathing and fatigue with exertion. Dr. Lobel's physical examination revealed Plaintiff was alert, oriented, in no acute distress, had clear lungs, and had an irregular heart rate and rhythm. Dr. Lobel determined that Plaintiff had recurrent atrial fibrillation, which he "suspect[ed]" contributed to Plaintiff's fatigue and exercise intolerance. (AR 1194.)

A September 29, 2009 electrocardiogram ("EKG") revealed Plaintiff's left ventricle was functioning normally with an ejection fraction of 60-65%. Plaintiff underwent cardioversion on October 20, 2009 without complications. During a urology consultation on October 21, 2009, Plaintiff was alert and in no acute distress, had normal spinal musculature with no tenderness, and his motor and sensory functions were intact. He reported no chest pain or recent cardiac problems and no breathing concerns.

Dr. Ades examined Plaintiff on January 20, 2010 and found Plaintiff's atrial fibrillation was controlled with medication, although the effects of his cardioversion had abated. Plaintiff reported feeling "pretty good" and denied having angina. (AR 3301.) He advised he had a relatively high threshold to breathlessness upon exertion. Dr. Lobel similarly observed on April 20, 2010 that Plaintiff "failed outpatient cardioversion" and was reluctant to initiate antiarrhythmic drug therapy. (AR 3295.) Plaintiff reported fatigue with decreased energy and a moderate reduction in his exercise tolerance, although his primary complaint was eczema. At a May 19, 2010 follow-up appointment

4

with Dr. Ades, Plaintiff advised that he felt "reasonably well" but had been experiencing worsening chronic fatigue since developing atrial fibrillation. (AR 3299.) He did not report any angina and had a high threshold to breathlessness on exertion. Dr. Ades opined that Plaintiff's sleep apnea might be a component of his fatigue.

On June 23, 2010, Plaintiff attended an intake appointment at the Walter Reed Medical Center's ("Walter Reed") Internal Medicine Clinic in Washington, D.C. with Stefan Eltgroth, M.D., who observed that Plaintiff did not appear in acute distress, uncomfortable, acutely or chronically ill, or acutely exhausted. Dr. Eltgroth maintained Plaintiff on Coumadin.

During a nuclear stress test performed on July 15, 2010, Plaintiff was able to exercise six minutes to a peak heart rate of 160 even though he was in atrial fibrillation that day, and although he was fatigued, he had no angina at peak exercise and a left ventricular ejection fraction of 50%. Plaintiff subsequently presented to Dr. Ades on July 28, 2010 and denied recent bouts of atrial fibrillation. Dr. Ades determined Plaintiff was doing "pretty well clinically" and his nuclear stress test showed he was at "relatively low risk in the absence of anginal symptoms." (AR 3258.) Dr. Ades found that Plaintiff's cholesterol was still elevated and needed to be better controlled.

On October 19, 2010, Eric F. Wedham, M.D., saw Plaintiff at Walter Reed for CAD, hyperlipidemia, atrial fibrillation, sleep apnea, and hypergonadism. Plaintiff was examined by Manju Goyal, Dr. Wedham's Fellow, who observed that Plaintiff was "[v]ague about his symptoms" but reported having shortness of breath at rest and when walking up one flight of stairs. (AR 1881.) Plaintiff also reported experiencing severe fatigue. Plaintiff did not have palpitations, chest pain, or dizziness. Plaintiff reported to Dr. Wedham that, following a myocardial infarction in 2003, his cardiac symptoms were stable with no angina and minimal exercise intolerance until the summer of 2009, when his atrial fibrillation returned. Dr. Wedham observed Plaintiff had no records of ambulatory event or Holter monitoring, rendering it "uncertain whether he has truly rate controlled atrial fibrillation." (AR 2651.) Plaintiff further advised Dr. Wedham that he had been diagnosed with sleep apnea and given a CPAP machine that he could not

5

tolerate. Dr. Wedham recommended basic ambulatory event monitoring, an endocrine evaluation, and a follow-up consultation with a sleep specialist.

Plaintiff underwent cardiac catherization at Walter Reed on November 17, 2010, which demonstrated that Plaintiff had moderate nonobstructive CAD. That same day, Plaintiff reported to pulmonologist Jimmy Suvatne, M.D., that he had random shortness of breath during exertion and at rest and walked for relief. He did not have a cough, wheezing, or palpitations. Upon physical examination, Dr. Suvatne found Plaintiff in no acute distress with normal respiratory functioning and an irregular heart rhythm but normal heart rate. Dr. Suvatne opined that Plaintiff's difficulty breathing is likely due to heart disease but may be related to obesity and advised that the use of his CPAP might improve his heart condition.

At a December 22, 2010 appointment with Dr. Wedham, Plaintiff complained of fatigue, difficulty with exertion, and lightheadedness. Dr. Wedham noted that Plaintiff had been furnished with a LifeWatch ambulatory monitor and had demonstrated better heart rate control since his cardiac catheterization. Plaintiff reported no chest pains, fainting, palpitations, coughing, wheezing, or mucus production. Although an EKG showed he was in atrial fibrillation, a cardiac examination revealed that his heart rate was controlled. Dr. Wedham opined that Plaintiff's fatigue was "mostly exertional related[,]" could not be explained by his CAD, and "appear[s] not to be related to [the] poorly controlled rate with his atrial fibrillation." (AR 2641.)

A January 4, 2011 EKG revealed that Plaintiff was in atrial fibrillation.[3] On February 22, 2011, Plaintiff saw Dr. Wedham who observed that Plaintiff had started dofetilide medication approximately one month prior and did not report any palpitations,

---

[3] The ALJ asserted that Plaintiff had an ablation in early January and was released from the hospital on January 27, 2011. He cited a dermatology note from Dr. Christopher Nolan indicating in the patient narrative field that Plaintiff had "just been released from in patient status after cardiac ablation[.]" (AR 1794.) The administrative record does not appear to contain the medical records relating to the ablation. Plaintiff testified at the ALJ hearing that his upcoming 2015 ablation would be his first.

chest pain, presyncope, or syncope.[4] Plaintiff was ambivalent regarding whether his shortness of breath had changed but noticed that he was "distinctly less short of breath" when climbing stairs and hills. (AR 1783.) A physical examination revealed no abnormalities. Dr. Wedham opined that Plaintiff was responding positively to the dofetilide.

In March of 2011, Plaintiff met with Dr. Suvatne and reported experiencing shortness of breath at rest and upon exertion at random times of the day. Dr. Suvatne opined that Plaintiff's history was "not consistent with any particular etiology[.]" (AR 1749.) Two days later, Dr. Wedham recorded that Plaintiff continued to report daily periods of fatigue although he had a normal sinus rhythm since beginning dofetilide. Dr. Wedham advised Plaintiff that his obstructive sleep apnea was "a major obstacle to optimally treating the atrial fibrillation as well as his [hypertension]." (AR 1736-37.)

At a May 11, 2011 appointment with Dr. Wedham, Plaintiff stated that he had noticed an increase in his fatigue and shortness of breath in the ten days prior to the appointment. Upon examination, Dr. Wedham determined that Plaintiff had reverted to atrial fibrillation. Plaintiff underwent a second cardioversion in May of 2011. At a June 20, 2011 follow-up appointment with Dr. Wedham, Plaintiff reported "modest amounts of fatigue prompting him to take a brief nap in the early afternoon for about 30 minutes." (AR 1986.) Plaintiff denied heart palpitations and stated he exercised two to three times every week with a trainer without any significant limitations. He had not obtained additional treatment for his sleep apnea. Dr. Wedham observed upon physical examination that Plaintiff was fully oriented and alert, in no apparent distress, had a clear chest, and exhibited normal cardiac functioning. A June 21, 2011 computed tomography scan of Plaintiff's neck revealed multi-level degenerative changes in his cervical spine and an old clavicular fracture but was otherwise unremarkable.

---

[4] Syncope constitutes the "[l]oss of consciousness and postural tone caused by diminished cerebral blood flow." Stedman's Medical Dictionary (2014), *available at* Westlaw STEDMANS 875540. In the context of cardiac impairments, syncope is "fainting with unconsciousness of any cardiac cause." *Id.* at 875560.

7

Plaintiff exchanged emails with Dr. Wedham in October of 2011, in which Plaintiff described having shortness of breath, lack of sleep, and an increased heart rate; feeling off balance; having nausea; and feeling jittery over the past four to seven days. He explained that these were the same symptoms he experienced before his cardiac arrest in 2003. Dr. Wedham called Plaintiff and encouraged him to go to the emergency room. In response, Plaintiff advised that he had two pre-planned trips to the Washington, D.C. area for other healthcare appointments and needed to "complet[e] a legal case that he worked on for two years in Baltimore" which interfered with his ability to schedule a follow-up procedure. (AR 2734.)

On November 2, 2011, Dr. Wedham noted Plaintiff was back in sinus rhythm. Plaintiff underwent a stress test on November 29, 2011, during which he was in atrial fibrillation. At a December 1, 2011 follow-up, Dr. Wedham opined that the stress test revealed no perfusion abnormalities and that Plaintiff had recently gone to a sleep clinic, during which he received instructions for his CPAP.

At a January 18, 2012 appointment with Dr. Wedham, Plaintiff described having increased nausea and a reduced appetite with accompanied weight loss as well as feeling "off center[.]" (AR 1919.) A physical examination revealed no apparent distress, alertness and full orientation, overall clear respiratory functioning, and a fast heart rate with an irregular rhythm but no audible heart murmur. An EKG revealed rapid atrial flutter. Dr. Wedham observed that Plaintiff's pulmonary disease was "of uncertain etiology[]" and assessed Plaintiff as having atrial fibrillation which was responsive to dofetilide therapy but was now only borderline controlled. *Id.* Dr. Wedham also noted that Plaintiff was "more diligent" with the use of his CPAP. *Id.*

On March 9, 2012, Plaintiff reported to Dr. Wedham that he had lost twenty pounds with his "regular exercise program[]" and continued to experience significant fatigue without heart palpitations or racing heart symptoms. (AR 1909.) Dr. Wedham noted Plaintiff's heart rate was fast and irregular. Plaintiff's LifeWatch telemetry monitoring demonstrated he had been in atrial fibrillation for several days, but his heart had spontaneously converted back to a sinus rhythm. In a May 11, 2012 email, Dr.

8

Wedham advised Plaintiff he could "continue to workout" but instructed Plaintiff to refrain from isometric exercises such as steady weightlifting and instead engage in moderate walking and work on his farm. (AR 2811.) Plaintiff noted that he could not undergo any procedures between June 18 and 23, 2012 because he would be taking his rabbinical school final exams followed by ordination.

Plaintiff attended an appointment with rheumatologist Christopher Lee Tracy, M.D., at Walter Reed on June 25, 2012 for muscle weakness in his upper arms, occasional leg cramping, fatigue, and shortness of breath. Plaintiff told Dr. Tracy that he experienced increased soreness after workouts but denied having any weakness in his lower extremities. Dr. Tracy examined Plaintiff and determined he had no physical abnormalities, a normal gait, intact sensation, full strength in his arms and legs, and a full range of motion. Dr. Tracy provisionally diagnosed Plaintiff with inflammation of the muscle, which was confirmed through a magnetic resonance image of Plaintiff's upper legs; however, an electrodiagnostic study conducted the next day was normal.

Plaintiff underwent a third cardioversion procedure on June 27, 2012 which was successful. However, Holter monitoring conducted on July 6, 2012 revealed that Plaintiff had returned to atrial fibrillation. Plaintiff complained of intermittent fatigue with muscle aches but reported that he continued to exercise. Although Plaintiff remained on Coumadin, he had stopped taking dofetilide. Dr. Wedham counseled Plaintiff about the importance of treating his sleep apnea with CPAP and recommended that he use a heart rate monitor.

Plaintiff reported to Gregory John Argyros, M.D., at Walter Reed's Pulmonary Disease Clinic on July 31, 2012 that he had shortness of breath at rest but not while walking inside, on level ground, up steps and hills, or while jogging or running. Dr. Argyros noted Plaintiff continued to have "a high level of activity" despite remaining in atrial fibrillation. (AR 2307.) A chest x-ray taken that day showed no lung disease or pulmonary abnormalities, but that Plaintiff had CAD and degenerative changes in his spine.

On August 2, 2012, Plaintiff attended a rheumatology consultation with Dr. Tracy at which he stated he consistently exercised twice per week. His workouts were comprised of weightlifting for thirty-five minutes and cardio exercises for twenty-five minutes. Plaintiff reported he could bench press seventy pounds on each side, military press seventy pounds on each side, engage in lateral muscle exercises with seventy pounds on each side, and could leg press 240 pounds. He could also lift sixty-pound bales of hay while working on his farm. Although Plaintiff reported mild muscle pain after his workouts and occasional leg cramps, Dr. Tracy opined that Plaintiff's muscle pain was proportionate to his level of exertion and that Plaintiff had "no precipitous decline in activity level or strength." (AR 2039.)

Plaintiff underwent a fourth cardioversion in early October of 2012 and experienced atrial fibrillation throughout his hospitalization with a heart rate of 90-120 beats per minute. He was prescribed dofetilide and noted to be noncompliant with CPAP. At a follow-up appointment with Dr. Wedham on December 17, 2012, Plaintiff reported he was able to continue with "some level of exercise" following the cardioversion and felt "reasonably well[.]" (AR 2277.) Dr. Wedham remarked that Plaintiff had a transesophageal echocardiogram taken during his hospitalization demonstrating no significant valvular abnormalities or evidence of left atrial thrombus. Plaintiff had not been on statin medications for over nine months and noted no muscle pain. A cardiac examination revealed an irregular heart rhythm and rapid heart rate with no audible murmur. Dr. Wedham prescribed a beta blocker. He further noted that Plaintiff's creatine kinase was persistently elevated, and a blood panel revealed Plaintiff had poorly controlled lipids.

At a January 28, 2013 nutrition consultation, Plaintiff reported that he had lost twenty pounds intentionally and exercised with a personal trainer twice every week for one hour, during which he did cardio and strength exercises, and that he was "very active as he lives on a farm." (AR 2760.) At a January 30, 2013 appointment with Dr. Tracy, Plaintiff noted weakness when he lifted objects. Dr. Tracy examined Plaintiff and found he was alert and fully oriented, in no acute distress, had normal respiratory and

cardiovascular functioning, a normal gait, intact sensation, and 5/5 strength in his arms and legs with a full range of motion. He opined that Plaintiff's symptoms had progressed mildly since he had discontinued statin medication. On March 11, 2013, Dr. Tracy referred Plaintiff to the orthopedic department for his muscle aches. After the orthopedic department "refuse[d] [to] consult[,]" (AR 2242), Plaintiff instead underwent a muscle biopsy that revealed no evidence of inflammation.

Plaintiff reported to Dr. Wedham on May 10, 2013 that he was still able to exercise but felt fatigued, particularly in the early afternoons, prompting him to rest for fifteen to thirty minutes. Dr. Wedham observed that Plaintiff was still non-compliant with his CPAP. Upon examination, Dr. Wedham determined that Plaintiff had an irregular heartbeat but no angina or heart failure symptoms. He further advised that Plaintiff's exertional limitations were likely musculoskeletal and that his sleep apnea may contribute to his symptoms.

On June 7, 2013, Plaintiff saw Dr. Ades for a follow-up appointment related to his CAD and hyperlipidemia. Dr. Ades opined that Plaintiff is likely in atrial fibrillation more often than he is in sinus rhythm, although Plaintiff denied having any angina or palpitations. Plaintiff reported that he had stopped exercising, experienced intermittent shortness of breath, and was working part-time as a lawyer and rabbi. Dr. Ades recommended that Plaintiff resume taking lovastatin.

Plaintiff saw Dr. Wedham again on August 21, 2013 and October 23, 2013. Plaintiff reported that he was not "particularly attentive" (AR 2223) to his CPAP machine, and Dr. Wedham recorded that management of Plaintiff's sleep apnea was "suboptimal to date." (AR 2219.) Plaintiff continued to report weakness and episodic shortness of breath, which Dr. Wedham opined "most closely correlate[ed] with atrial fibrillation with rapid ventricular response." (AR 2223.) Dr. Wedham observed that Plaintiff had no angina or heart failure symptoms and that his musculoskeletal limitations, for which he was seeing a physical therapist, remained orthopedic. The August treatment notes reflect that Plaintiff started taking lovastatin several weeks prior

to the appointment. By October, Plaintiff's atrial fibrillation was borderline controlled and Dr. Wedham was uncertain if it was persistent.

On January 13, 2014, Plaintiff saw Dr. Wedham for a follow-up appointment related to his atrial fibrillation, hyperlipidemia, and CAD, during which Plaintiff reported that he suffered from fatigue but remained active on his farm. He had some intermittent shortness of breath but no chest pain, no angina, and no heart failure symptoms. Dr. Wedham observed that Plaintiff was "not consistent in any way" in treating his sleep apnea and counseled Plaintiff that management was "imperative" if he wanted "to make any headway with regards to the atrial fibrillation and with his symptoms of fatigue and shortness of breath." (AR 2215, 2216.) Plaintiff expressed an interest in ablation, and Dr. Wedham explained that the success of an ablation would be "significantly limited" due to his untreated sleep apnea. (AR 2217.)

On June 6, 2014, Plaintiff wrote to Dulcie Spoo at the Social Security Administration that he had a second heart attack and had been hospitalized for five days at Fletcher Allen, where he had two stents implanted. He explained that he had been enrolled in cardiac rehabilitation with Dr. Ades three times per week for twelve weeks, consisting of a one-hour monitored cardiac workout and one hour cardiac class, and wished to be reconsidered for disability benefits.

## B.    Plaintiff's Function Report.

Plaintiff submitted a function report on September 11, 2013[5] in which he indicated his conditions limited him because he (1) worked less than forty hours per week; (2) had to take "[m]andatory" thirty-to-forty minute breaks in the middle of the day (AR 597); (3) had to hire help for his law office, household, and farm; and (4) required help with client interviews, investigations, proceedings, appeals, and driving long distances. He reported that he takes care of pets and animals with assistance, provided farrier care for his draft horses, and brushed and trained his horses, although his spouse, who is a veterinarian, was their primary trainer.

---

[5] The ALJ referred to this function report as the July 2013 Function Report, although the cited report is dated September 11, 2013. The court assumes this is a typographical error.

12

Plaintiff further stated he had no problems with personal care; prepared his own meals daily; engaged in limited cleaning, dishwashing, vacuuming, laundry, yardwork, landscaping, and car care without help and for a minimum of one half-day depending on the task; walked, drove, and rode a bicycle alone; and shopped in stores and online two times every week for one hour excluding driving time. He indicated his physical activity was limited but that he exercised with a personal trainer and regularly attended synagogue, town meetings, and interfaith events alone and without a reminder. In addition, he stated he had an unlimited ability to pay attention and no problems following written and spoken instructions or getting along with authority figures.

### C.    State Agency Consultant Reports.

On January 9, 2014, Plaintiff saw Charles Gluck, M.D., for a consultative examination. After reviewing all medical records available to him, Dr. Gluck examined Plaintiff and found that he was in no distress and had a 5/5 grip strength, no joint abnormalities in his arms and legs except for a right clavicle lump related to an old injury, no gait abnormalities, no instability, a normal squatting ability, normal motor function in his upper and lower extremities, and normal respiratory and neurological functioning. He noted Plaintiff had tenderness along his spine with a reduction in the range of motion in his neck and reduced flexion in his hips. He further observed that Plaintiff exhibited no evidence of pain during the examination.

Dr. Gluck recorded that Plaintiff had significant heart disease with intermittent atrial fibrillation and, in his examination, detected decreased heart sounds but a regular rhythm and no murmurs. A June of 2012 stress test revealed good left ventricle ejection fraction and no ischemia. Dr. Gluck opined that Plaintiff's shortness of breath appeared to be unrelated to congestive heart failure. For his functional assessment, Dr. Gluck advised that Plaintiff had no standing or sitting limitations, could walk for six hours in an eight-hour workday, could lift or carry twenty-pounds frequently and fifty pounds occasionally, and had no postural or manipulative limitations.

On April 18, 2014, state Disability Determination Services reviewing physician Geoffrey Knisely, M.D., reviewed Plaintiff's medical records and opined that Plaintiff

could lift twenty-five pounds frequently and fifty pounds occasionally, could stand or walk for six hours in an eight-hour workday, could sit for six hours in an eight-hour workday, and had no postural, pushing, or pulling limitations. He further advised that Plaintiff was limited in his overhead bilateral reaching and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.

## D. Testimony at the ALJ Hearing.

At the November 12, 2015 hearing before ALJ D'Alessandro, Plaintiff testified that he works as a lawyer no more than forty hours per month with help from his assistant, Ms. Brown. He stated that he previously required Ms. Brown's assistance infrequently, but that he now needed her to help move boxes of exhibits or books, conduct client interviews and investigations, draft memoranda and pleadings, oversee his social media, and generally assist in the administration of his law practice and a non-profit foundation he started. He testified that when he is in court and needs to catch his breath, he informs judges that he needs to take a break, and they are generally accommodating.

Since the onset of his health problems, Plaintiff testified that he has had to turn away clients and sometimes wakes up gasping for air, or is dizzy or nauseated, and those symptoms affect his ability to work consistently in the morning. He sleeps only three to four hours every night and "hate[s] sleeping with a BiPAP" machine. (AR 206.) He generally rests for twenty to thirty minutes every day. Because of Plaintiff's self-employment, he generally has the flexibility to attend doctors' appointments and adjust his workload. Plaintiff further stated that he cannot drive long distances on his own. When he performed rabbinical services, he needed to ensure he received plenty of rest prior to the services to avoid breathing problems.

Plaintiff testified regarding an October 20, 2015 appointment for an ablation, which was not performed because his physicians discovered a blood clot that was dissolved with medication. He characterized his arrythmia and atrial fibrillation as "what got [him] here in the first place." (AR 203.)

14

### III.   ALJ D'Alessandro's March 2, 2016 Decision.

An ALJ must follow a five-step, sequential framework to determine whether a
claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a
> "residual functional capacity" assessment, whether the claimant can
> perform any of his or her past relevant work despite the impairment; and
> (5) whether there are significant numbers of jobs in the national economy
> that the claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.

§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of

proving that he or she has a disability within the meaning of the Act, and bears the burden

of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step

framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128

(2d Cir. 2008) (citation and internal quotation marks omitted). At Step Five, "the burden

shift[s] to the Commissioner to show there is other work that [the claimant] can perform."

*McIntyre*, 758 F.3d at 150 (alterations in original).

In this case, the ALJ concluded at Step One that Plaintiff's date last insured was

December 31, 2013. The ALJ also determined that Plaintiff did not engage in substantial

gainful activity from his AOD of December 31, 2008 through his date last insured. The

ALJ noted that Plaintiff's application alleged an onset date of disability on December 31,

2008 which Plaintiff later claimed was incorrect and should be November 7, 2013, which

was both the date he became ineligible for private disability insurance benefits and the

date of his sixty-fifth birthday. The ALJ did not treat Plaintiff's correction as an

amendment to his onset date because Plaintiff did not clearly designate it as such and did

not raise it at the hearing. As a result, the ALJ examined the relevant period starting from

the December 31, 2008 original onset date set forth in Plaintiff's application. However,

the ALJ's decision reflects consideration of evidence after November 7, 2013.

At Step Two, the ALJ found that Plaintiff had the following severe impairments: paroxysmal atrial fibrillation, CAD, ischemic heart disease, obstructive sleep apnea, degenerative disc disease, osteoarthritis, chronic pulmonary insufficiency, and polymyositis. The ALJ concluded at Step Three that none of Plaintiff's severe impairments, individually or collectively, met or exceeded the definition of a listed impairment.

At Step Four, the ALJ determined that Plaintiff had the RFC to perform the full range of medium work as defined in 20 CFR § 404.1567(c), which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds" and includes "sedentary and light work." 20 C.F.R. § 404.1567(c). The ALJ concluded that Plaintiff was capable of performing his past work as an attorney because although Plaintiff reported no net income from this work beginning in 2009, Plaintiff's income was well above the substantial gainful employment level between 2001 and 2008, and because his past work as an attorney at the skilled sedentary level was well within his exertional restraints. For this reason, the ALJ found that Plaintiff was not disabled from December 31, 2008 through December 31, 2013.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).

It is the Commissioner who resolves evidentiary conflicts and determines credibility issues, and the court "should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *see also Aponte v.*

16

*Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (noting "genuine conflicts in the medical evidence are for the Secretary to resolve"). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

## B. Whether the ALJ Committed Legal Error in Applying the Incorrect Alleged Onset Date.

Plaintiff argues that the ALJ's decision should be reversed because the ALJ denied Plaintiff's application based on the wrong AOD. Plaintiff points out that he corrected his AOD to November 7, 2013[6] prior to the ALJ's hearing. An individual's AOD is the first day a person alleges that he or she "became unable to perform substantial gainful activity." *Duval v. Colvin*, 2014 WL 4637092, at *6 (N.D.N.Y. Sept. 16, 2014). "If a claimant decides to amend his or her AOD, he or she can do so by contacting [the Social Security Administration] via letter, telephone, visiting a field office, or by providing testimony at a hearing." *Michael C. v. Comm'r of Soc. Sec.*, 2019 WL 7293683, at *3 (N.D.N.Y. Dec. 30, 2019) (alteration in original) (citation and internal quotation marks omitted).

Even if the ALJ should have amended Plaintiff's AOD to November 7, 2013, any failure to do so was harmless. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (declining to remand where there was "no reasonable likelihood" that missing information "would have changed the ALJ's determination that Petitioner was not disabled"); *see also Michael C.*, 2019 WL 7293683, at *5 (declining to remand when the ALJ cited the wrong AOD date as it was "unlikely that weighing similar opinions which pre-dated the amended AOD would have changed the ALJ's analysis or ultimate

---

[6] Plaintiff states in his brief he corrected his AOD to November 8, 2013. Plaintiff's pre-hearing submission to the ALJ states that his "[a]lleged onset date of 12/31/2008 is incorrect. Correct answer is SSA (Claimant's 65th Birthday 11/07/2013)." (AR 659.)

decision"). The ALJ considered Plaintiff's medical records through Plaintiff's date last insured of December 31, 2013 and thereafter. Plaintiff cites no evidence that was excluded as the result of an alleged incorrect AOD that would have affected the disability determination. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

Because there is "no reasonable likelihood" that the ALJ's disability determination would have changed with a correction to the AOD, *see Zabala*, 595 F.3d at 410, the court DENIES Plaintiff's motion for a judgment reversing the Commissioner's decision on this basis and GRANTS the Commissioner's motion to affirm.

## C. Whether the ALJ's RFC Determination Is Supported by Substantial Evidence.

Plaintiff argues that the ALJ's RFC assessment of moderate work is not supported by substantial evidence because "[c]learly the testimony and records support that the Plaintiff lacked the ability to perform those skills on a sustained basis." (Doc. 9-1 at 3.) "If there is substantial evidence to support the [ALJ's] determination, it must be upheld." *Selian*, 708 F.3d at 417. "An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits us to glean the rationale of an ALJ's decision.'" *Cichocki*, 729 F.3d at 178 n.3 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)); *see also Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983) (noting that an ALJ need not "reconcile explicitly every conflicting shred of medical testimony"). An ALJ, however, must consider "all evidence" in the record before making a determination as to whether a claimant is eligible for benefits. 20 C.F.R. § 404.1520(a)(3).

Plaintiff contends that "[t]here was no question based on the sheer volume and contents of the medical reports and notes, combined with the testimony of Ms. Brown and the Plaintiff[,] that the limits on the Plaintiff's ability to perform basic work activities was severe." (Doc. 9-1 at 3.) As a threshold matter, the volume of records alone does not warrant reversal absent evidence that the ALJ's RFC assessment is unsupported by

substantial evidence. *See Thompson v. Comm'r of Soc. Sec.*, 2018 WL 4103181, at \*3 (W.D.N.Y. Aug. 29, 2018) (holding the "sheer volume of records alone does not require remand, and it is not this Court's obligation to sift through these records unaided by counsel[]" in determining that the Appeals Council was not required to consider new evidence).

Here, the ALJ reviewed approximately 3,900 pages of medical records, which he summarized in exhaustive detail in a nineteen-page decision. Although he found Plaintiff's medical record supported a history of CAD, proximal atrial fibrillation, obesity, and other impairments, he concluded that Plaintiff's "activities are inconsistent with his allegations of severe limitations associated with these impairments." (AR 86.) Not only did Plaintiff work consistently throughout the alleged period of disability as a part-time lawyer and rabbi, including driving 9,679 miles in 2011 for a legal case in Baltimore, he exercised frequently and performed vigorous activities on his farm. Although he reported only approximately \$700 of income during the relevant period, he reported substantial expenses incurred in the practice of law. As the ALJ further explained:

> The claimant reported in May 2011 that he began working out with a personal trainer about six months prior. In August 2012, the claimant reported in exam notes that he continues to work out twice a week, which includes 35 minutes of weight lifting and 35 minutes of cardiovascular exercise. He stated he can bench press 70 pound[s] each side, military press 70 pounds each side, work lats with 70 pounds, and can leg press 240 pounds. The provider also noted that he lives on a farm and can lift 60-pound bales of hay.

*Id.* (record citations omitted).

The ALJ noted that Plaintiff reported to Dr. Wedham in May of 2013 that he only needed to rest for fifteen to thirty minutes in the early afternoon. In January of 2014, "just after the date last insured," the ALJ observed that Plaintiff told Dr. Wedham "that he was able to perform activities around his farm in Vermont[.]" (AR 87) (record citations omitted). Plaintiff's September 11, 2013 Function Report, dated just two

19

months before his corrected AOD and four months prior to his date last insured, confirms his physicians' assessments that he was very active in his activities of daily living.

In evaluating the opinion evidence, the ALJ accorded great weight to Dr. Gluck's opinion because it was issued shortly after Plaintiff's date last insured and because Dr. Gluck's conclusions were consistent with his examination and the medical record. The ALJ also gave great weight to Dr. Knisely's opinion because it was consistent with Dr. Gluck's and Dr. Wedham's examination notes, except for Dr. Knisley's reaching restrictions which were inconsistent with Plaintiff's weightlifting and hay bale lifting.

The ALJ gave little weight to Ms. Brown's testimony because she generally worked remotely, had no vocational expertise, and her testimony predominantly related to Plaintiff's health after the date last insured. *See Vicky M. v. Comm'r of Soc. Sec.*, 2018 WL 4119112, at *9 (N.D.N.Y. Aug. 28, 2018) (upholding an ALJ's decision to afford little consideration to a letter from the plaintiff's former employer who was a nonmedical source and "had no basis to determine Plaintiff's capacity for other work"). The ALJ determined that Plaintiff could continue to perform his past relevant work as an attorney which is "classified as sedentary and skilled and is not precluded by [Plaintiff's] RFC that provides for work up to medium exertional level with no cognitive limitations alleged or in evidence." (AR 89.)

The court agrees with the Commissioner that the ALJ's disability determination is supported by substantial evidence. To the extent that Plaintiff challenges the ALJ's analysis of his subjective reports of his symptoms, "an ALJ's credibility determination is generally entitled to deference on appeal." *Selian*, 708 F.3d at 420; *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) (holding the Commissioner, not the court, "appraise[s] the credibility of witnesses").

> When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, . . . but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted). In addition to consistent employment and a wide range of activities during the relevant period, Plaintiff's medical records indicate he was frequently noncompliant with his CPAP, which Dr. Wedham and Dr. Suvatne both emphasized was a likely contributor to his atrial fibrillation, fatigue, and shortness of breath. *See Calabrese v. Astrue*, 358 F. App'x 274, 277-78 (2d Cir. 2009) (noting the ALJ's "adverse credibility finding" was "amply supported by evidence that [the plaintiff] . . . was noncompliant in taking the medication that was prescribed by [his] doctors"); *see also* 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled[.]").

Because the ALJ's RFC determination concluding that Plaintiff can perform the full range of medium work is supported by substantial evidence, the court DENIES Plaintiff's motion for judgment reversing the Commissioner's decision and GRANTS the Commissioner's motion to affirm on this ground.

## D. Whether the ALJ Erred in Finding Plaintiff Could Perform His Past Relevant Work as an Attorney.

Plaintiff contends that the ALJ erred in finding Plaintiff was capable of performing his past work as an attorney because Plaintiff had "a seriously reduced work week and had to hire an Administrative Assistant to perform tasks that [he] could not do, as well as contracting help for duties at his residence." (Doc. 9-1 at 3.) He maintains that he was required to withdraw from and seriously limit participation in his private and professional "life networking and community involvement[,]" which constituted a "dramatic change" based on "limitations that were not in place fifteen years prior." *Id.*

"The RFC to meet the physical and mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy) is generally a sufficient basis for a finding of 'not disabled.'" SSR 82-62, 1982 WL 31386, at *3 (Jan. 1, 1982). A claimant's work experience, including part-time work, "applies when it was done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity." 20 C.F.R. § 404.1565(a); *see also Melville v. Apfel*, 198

21

F.3d 45, 52 (2d Cir. 1999) ("'[P]art-time work *that was substantial gainful activity*, performed within the past 15 years, and lasted long enough for the person to learn to do it constitutes past relevant work, and an individual who retains the RFC to perform such work must be found not disabled.'") (emphasis in original) (quoting SSR 96-8p, 1996 WL 374184, at *8 n.2 (July 2, 1996)). Work is "substantial" if it "involves doing significant physical or mental activities" and is "gainful" if "it is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §§ 404.1572(a)-(b).

The determination of a claimant's ability to perform past relevant work requires "a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; [and] (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work[.]" SSR 82-62, 1982 WL 31386, at *3. Plaintiff "has the burden to show an inability to return to [his] previous specific job *and an inability to perform [his] past relevant work generally[.]" *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis in original).

Although Plaintiff may have needed increased assistance in his law practice, he continued to work part-time as an attorney and to perform significant physical and mental activities throughout the relevant period. He also retained the ability to perform "the functional demands and job duties as *generally required*" of lawyers in the national economy. *Stacy v. Colvin*, 825 F.3d 563, 569 (9th Cir. 2016) (quoting SSR 82-61, 1982 WL 31387, at *2 (Jan. 1, 1982)) (emphasis supplied). Plaintiff reported in his September of 2013 Function Report that he had no cognitive limitations. He does not challenge the ALJ's characterization of his past work as an attorney as sedentary and skilled.

Because the ALJ's determination that Plaintiff could perform his past relevant work as an attorney is supported by substantial evidence, the court must DENY Plaintiff's motion to reverse and GRANT the Commissioner's motion to affirm.

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion for judgment reversing the Commissioner's decision (Doc. 9) and GRANTS the Commissioner's motion to affirm (Doc. 15).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 5th day of March, 2020.

Christina Reiss, District Judge
United States District Court